UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

ETHEL MARIE FONTENOT          :          DOCKET NO. 13-cv-595

VERSUS                        :          JUDGE MINALDI

U.S. COMMISSIONER OF SOCIAL
SECURITY                      :          MAGISTRATE JUDGE KAY

### REPORT AND RECOMMENDATION

Before the court is plaintiff's petition for review of the Commissioner's denial of disability insurance benefits and supplemental security income benefits. This matter has been referred to the undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

After review of the entire administrative record and the briefs filed by the parties, this court recommends that the Commissioner's decision should be AFFIRMED and this matter DISMISSED with prejudice.

## I.
### PROCEDURAL HISTORY

On July 28, 2010, plaintiff filed an application for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") alleging disability beginning on January 10, 2009. Tr. 263-66, 267-70. She claimed disability due to spine problems, bone disease, enlarged heart, hypertension and high cholesterol. Tr. 284. The claims were initially denied on January 5, 2011. Tr. 140-41. Plaintiff requested and was granted an administrative hearing which was held on November 3, 2011. Tr. 29-127. Plaintiff was represented by a non-attorney representative at the hearing.

On February 3, 2011, the Administrative Law Judge ("ALJ") issued a partially favorable decision. Tr. 13-24. In her decision, the ALJ found that plaintiff was not disabled since the date of her alleged onset; however, she determined that plaintiff became disabled on June 26, 2011, and was entitled to SSI beginning on that date. *Id.*

Plaintiff filed a request for appellate review of this decision and on January 18, 2013, the Appeals Council denied her request for review. Tr. 6-7, 1-3. On March 22, 2013 plaintiff filed suit in this court appealing the determinations of the Commissioner. Doc. 1.

## II.
### FACTS AND MEDICAL EVIDENCE

### A. *Facts*

Plaintiff was 55 years old on the date of the hearing which was held on November 3, 2011. Tr. 49. She testified that she worked at a bank for 25 years and had to leave due to carpal tunnel problems with her right hand. Tr. 49-50. After this she worked at a casino and Walmart. She left Walmart after three and one-half years because she was injured on the job and was in a lot of pain and was stressed. Tr.51, 57.

Plaintiff testified that she experiences a lot of pain in the lower part of her back, her neck, her arms, and both hands and wrists. Tr. 53. She stated that she has spasms in her back and the pain radiates up to her arm and neck. *Id.* Plaintiff stated that sitting is her most painful position. Tr. 55. She also experiences headaches. Tr. 54. She underwent surgery for carpel tunnel syndrome in her right hand. *Id.* Plaintiff also suffers from depression and she has been prescribed medication by her primary care physician. Tr. 56. She stated that she has never been hospitalized for mental health issues or been to counselling or treatment because her hospital does not refer to mental health counselling. Tr. 92.

Plaintiff testified that she owns a driver's license but does not drive because of pain in her right leg.  Tr. 56.  She lives with her parents and reports that her daily activities include eating, taking medications, sitting for a while, lying down or going back to sleep if she is hurting.  Tr. 301.  She reported problems sleeping and some problems dressing and bathing.  *Id.*  She does not participate in social activities but she is able to shop for food.  Her mother prepares most of her meals. Tr. 303-04.  When asked why she believes she is totally disabled an incapable of returning to work, plaintiff replied, "[b]ecause every time I try to do something, like stooping or walking or – it – my back still hurt[s] and my hands, my neck."  Tr. 94.

### B.  Medical Evidence

#### 1.  W.O. Moss Regional Medical Center

In March and June of 2008 plaintiff was seen at W.O. Moss as an outpatient.  The notes indicate that the visit was for a follow up concerning depression and hypertension.  She also complained of neck and shoulder pain.  Tr.  365, 67.  In May of 2009 she was seen for a follow up after a stress test.  The records indicate she was "doing well."  Tr. 351.  On September 30, 2009, she reported for a follow up for lab results.  Her history noted depression, hypertension, neuropathy, carpel tunnel syndrome surgery, and she complained of upper abdomen/epigastric pain. Tr. 349.

On May 21, 2010, plaintiff was seen in the ER at Moss Regional stating that she needed refills of all her medications.  She was prescribed medications and told to keep her appointments with her primary care physician.  Tr.342-46.  On August 2, 2010, she was seen as an outpatient and reported that she had not seen her primary care physician since September of 2009 and wanted to re-establish care.  Tr. 341.  In October of 2010 plaintiff was seen for follow up for hypertension and depression.  She reported that she was "doing well."  Tr. 416.

In June of 2011 plaintiff complained of rectal bleeding and a colonoscopy was performed on June 28, 2011.  Tr. 450, 466-67.  In July and September of 2011 she reported to the ER complaining of rectal bleeding.  Tr. 442-46, 436-40.  She was given medication and a surgery clinic appointment was scheduled.  Tr. 439.

On September 20, 2011, plaintiff reported to the ER with the complaint of "pain all over." Tr. 431.  Her medications were adjusted and she was advised to keep her primary care physician appointment.  Tr. 434.  On September 29, 2011 she reported to the ER for a blood pressure re-check.  She was give new medication and she reported feeling better.  Tr. 426-30.

### 2. *Jerry L. Whiteman, Ph. D.*

Plaintiff was seen by Dr. Jerry Whiteman on June 5, 2008, for a psychological evaluation. He administered the Minnesota Multiphasic Personality Inventory-II ("MMPI-II"), conducted a mental status/clinical interview, and made behavioral observations.

Plaintiff reported that she was last employed in 2004 as cashier and stocker. She stated that she performs very few household chores but helps her mother wash dishes and occasionally mop. She described her health history as including a broken right hand, carpal tunnel syndrome, hysterectomy, treatment for a fistula, bone disease diagnosed in 2001, and an injury while she was working in 2003 which resulted in back problems.

Plaintiff denied ever being in psychological care.  Her mental status was adequately oriented in all spheres.  She displayed adequate locomotion but complained that she sometimes drags her right leg.  She had adequate communication skills.  She complained of pain at the time of the evaluation of a six on a scale of one to ten.  Plaintiff is able to maintain her daily hygiene and her general fund of information and long term memory were low average.  Her pace and persistence was variable and her stream of mental activity was adequately organized on a simple

level.   Her short term memory and concentration was average.   She possessed adequate intermediate memory, limited ability for abstract reasoning, and her judgment and insight reflect knowledge of appropriate social and emergency behaviors.   Plaintiff has two friends that she enjoys visiting with but stated that she spends a lot of time lying down or watching television.   She does not cook, and rarely drives.

According to Dr. Whiteman, her responses to the MMPI-II either suggest serious psychological and emotional problems or she has distorted and greatly exaggerated her problems to create the impression of a severe psychological disorder.   Dr. Whiteman also noted that her scores may indicate reading difficulties or problems understanding the test items.   Dr. Whiteman's analysis of the MMPI-II reveals that plaintiff is experiencing moderate to severe emotional distress characterized by dysphoria, brooding, and anger.   He noted that she was fearful and easily frightened, and apprehensive.

Dr. Whiteman's impression following the exam was bipolar disorder, depressed, pain disorder, and schizotypal personality features.   He concluded that plaintiff's cognitive abilities were in low average range.   He found that she was depressed and expressing excessive concern about the functioning of her body.   He noted that she is self-centered, dissatisfied and demanding of attention or complaining.   He opined that she may use her complaints to avoid responsibility. He noted that "her exaggeration of some of her problems may indicate motivation to obtain secondary gain from her problems." Tr. 326-29.

On June 6, 2008, the day after he examined plaintiff, Dr. Whiteman completed a Mental Residual Functional Capacity Assessment.   This document was not initially a part of the administrative record.   Dr. Whiteman referred to the Mental RFC during his testimony at the hearing and submitted the form as evidence after the hearing adjourned. Tr. 75-77.   In his

assessment Dr. Whiteman opined that plaintiff displayed symptoms of anhedonia or pervasive loss of interest in all activities, psychomotor agitation or retardation, decreased energy, hallucinations, delusions or paranoid thinking, and emotional withdrawal and/or isolation.  He noted marked limitations in fourteen areas.[1]  He found that she was extremely limited in her ability to respond appropriately to work pressures in a usual work setting and moderately limited in three areas.[2]  Dr. Whiteman found that plaintiff was not significantly limited in her ability to carry out very short and simple instructions, ask simple questions or request assistance, and be aware of normal hazards and take appropriate precautions.  He based his opinion of plaintiff's limitations on the results of her MMPI-II test and her mental status examination.  Tr. 468-70.

### 3.  Mary Mathai, M.D.

A nerve conduction study of both of plaintiff's upper extremities conducted on April 14, 2009, revealed mild bilateral carpal tunnel syndrome.  There was no evidence of ulnar entrapment neuropathy.  Tr. 330-31.

### 4.  LSU University Medical Center

A stress test administered on June 3, 2009, was normal, there was no indication of ischemia. Tr. 381-84.  Plaintiff was referred for an orthopedic consultation in July of 2009 for complaints of bilateral wrist pain and neck and back pain.  Tr. 376-78.  An MRI of her cervical spine dated August 5, 2009 showed mild cervical spondylosis.  Tr. 375.  Notes from a visit to the cardiology

---

[1] Dr. Whiteman noted marked limitations in the following areas: plaintiff's ability to remember locations and work-like procedures, understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, make judgments on simple work-related decisions, complete a normal workday and workweek without interruptions, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and to adhere to standards of neatness and cleanliness, respond to changes in the work setting, travel in unfamiliar places or use public transportation, set realistic goals or make plans independently of others.

[2] Dr. Whiteman found plaintiff moderately limited in her ability to understand and remember very short and simple instructions, interact appropriately with the public, and accept instructions and respond to criticism from supervisors.

clinic on August 20, 2009, are illegible.  Tr. 374.  An August 27, 2009, MRI of her cervical spine showed degenerative changes which appeared stable.  An MRI of the lumbar spine on the same date showed central canal stenosis and right lateral recess stenosis at L5-1 and bilateral foraminal narrowing at L5-1 which findings appeared stable.  Tr. 370.

### 5.  G. Jon Haag, Psy. D.

Plaintiff underwent a consultative mental status evaluation conducted by clinical psychologist G. Jon Haag on October 1, 2010.  Prior to his examination he reviewed the June 5, 2008, report from Dr. Whiteman and Moss Regional outpatient clinic notes dating back to 2008.

Plaintiff gave a history of bipolar disorder, spondylosis and a neck injury following a car accident in 2005.  She stated that she was currently receiving treatment for depression by her primary care physician.  Plaintiff's social and adaptive functioning were reviewed. Dr. Haag opined that she did not appear to have any impairment in social functioning.  He noted that she got along well with others but was less likely to seek interaction and her patience has decreased. Plaintiff's activities of daily living were mildly impacted.  She can care for her personal hygiene, pay bills, take medication, drive and cook but she does not drive often due to problems with her leg.

Plaintiff indicated that she feels depressed nearly every day, is tearful, has problems with sleep, her appetite is variable, and she has a loss of interest in activities but has no suicidal ideation. She reported that she attempted to work part time in 2008 but could not handle the stress of the job.  She worked for 25 years proofing checks at a bank and last worked full time in 2002.

Dr. Haag noted that plaintiff's hygiene and grooming were appropriate and she was cooperative.  She did not appear depressed but became tearful when talking about the ill health of her parents.  He found no evidence of psychosis, she was not anxious, and her memory was not

impaired.  Plaintiff's concentration was also not impaired, and her intellectual functioning was expected to be average.

Dr. Haag's diagnostic impression was major depressive disorder, recurrent, mild. He found no evidence to support a diagnosis of schizotypical personality disorder even though it was noted on a previous exam.  He opined that plaintiff was able to understand and follow simple instructions and capable of handling funds.  Tr. 391-93.

### 6.  Pamela Martin, Ph.D.

On October 29, 2010 Dr. Martin opined there was no medical evidence of record to support the presence of severe a mental health impairment and that plaintiff suffered only from mild mental limitations.  Tr. 147.

### 7.  Thomas Voitier, M.D.

Dr. Voitier conducted a consultative physical examination on December 11, 2010. Dr. Voitier reviewed plaintiff's cervical spine and lumbar spine MRI's from 2010 and her stress echocardiogram from 2009.  Plaintiff complained of non-radiating neck pain of a five on a scale of one to ten for the past three years.  She also reported lower back pain radiating up her spine for past ten years.  She stated that she hurt her back while working at Walmart.  She complained of mid-sternal non-radiating chest pain when she lies down.

Plaintiff past medical history includes hypertension, hyperlipidemia, depression, cervical spondylosis, and lower back pain.  Upon examination Dr. Voitier found plaintiff had a 45 degree range of motion in her neck with no tenderness, a negative bilateral straight leg test, and a slightly limited range of motion in her neck.  Plaintiff's gait was normal, she was able to rise from sitting position without assistance, stand on her tiptoes, heel and tandem walk without problems, and bend and squat.  She had 5/5 grip strength with adequate fine motor movements and ability to grasp

objects bilaterally.  He found no limitations in dexterity of movements.  She had good motor tone and possessed 5/5 muscle strength bilaterally in all muscle groups.

Plaintiff appeared mentally alert, oriented, and cooperative, and did not appear depressed or anxious.  She was able to communicate, her recent and remote memory were intact, and she possessed good insight and cognitive function.

Dr. Voitier's diagnosis was cervical spondylosis, lower back pain, atypical chest pain, likely non- cardiac, hypertension, hyperlipidemia, and depression.  He concluded that she has mild limitation in range of motion in her cervical spine (rotation only), her straight leg test is negative, her gait is normal, her MRI findings appear to be stable and benign.  Based on his findings he opined that plaintiff should be able to walk and stand for a full work day, lift/carry objects without limitation, hold a conversation, respond appropriately to questions, and carry out and remember instructions.  Tr. 395-97.

### 8. Barnabas Fote, M.D.

On December 18, 2010, Dr. Fote conducted a consultative physical examination.  Plaintiff complained of back problems since 2003 when she was diagnosed with spondylosis.  She complains of pain of a six to seven out of ten radiating to her right leg.  She also reported being diagnosed with a bulging disc in her cervical spine with pain of an 8 out of 10.  She stated that the pain is localized on the left side of her neck and radiates to her left arm causing numbness of her upper left arm.  She stated that reaching for something makes the pain worse.  Plaintiff reported being diagnosed with hypertension and an enlarged heart and alleges shortness of breath at night and after walking one block.  She complained of chest pain at night for the past year and a half that lasts for five minutes about three times a week.  She stated that she has had rectal bleeding

weekly since 2000.  She reported that she was diagnosed with depression four years ago but is stable on medication and has no suicidal ideation.

Plaintiff's past medical history includes hypertension, thyroid disease, and enlarged heart. She is independent in all activities of daily living except reported that she needs assistance with dressing, grooming, looking up numbers, using public transportation, and making meals.  She stated that she depends on someone else to drive and do housework.

Upon examination Dr. Fote noted that plaintiff was alert, oriented, able to walk without assistance or assistive devices, and get up on the exam table without assistance.  Her gait and station were normal.  She appeared sad with a flat affect but communicated well, understood instructions, and was cooperative.  She appeared to have normal recent and remote memory and normal cognition.

Dr. Fote noted no lymphadenopathy, thyromegaly or masses in her neck, her upper body grip was a 5/5 bilaterally, deep tendon reflexes were normal, her hands can be fully extended and fingers fully opposed and she is able to make fists bilaterally.  Her lower extremities were 5/5 strength bilaterally, no edema or swelling was noted, no ankle tenderness was noted.  There was no lumbar muscle spasm or tenderness noted.  She was able to walk on her tiptoes, heel walk, and squat normally.

Following his examination Dr. Fote diagnosed back pain, neck pain, hypertension, history of rectal bleeding, and depression.  He opined that based on his musculoskeletal exam plaintiff should be able to stand and sit.  She can pull, push, kneel, crawl, and crouch as tolerated.  She can reach, grasp, handle, and finger objects.  Plaintiff needs no assistive devices and her hearing and speech are normal.

### 9.   *Maria Pons, M.D.*

Dr. Pons completed a physical residual functional capacity assessment on January 5, 2011. She determined that plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and walk for 6 hours in an 8 hour work day, sit for 6 hours in an 8 hour work day, and had unlimited push and pull ability.  Plaintiff was limited to occasional climbing of ramps and stairs, climbing ladders, ropes and scaffolds, stooping, kneeling, and crawling.  She was not limited in her ability to balance.  Plaintiff was limited in reaching overhead (left and right) but had unlimited gross and fine manipulation.  She had no visual, communicative, or environmental limitations.  She opined that plaintiff maintained the ability to perform light work with limitations on overhead reach bilaterally and the above postural limitations. Tr. 148-49, 409-10.

## III.
### STANDARD OF REVIEW

"In Social Security disability cases, 42 U.S.C. § 405(g) governs the standard of review." *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002) (citing *Frith v. Celebrezze*, 333 F.2d 557, 560 (5th Cir. 1964)).  The court's review of the ultimate decision of the Commissioner is limited to determining whether the administrative decision is supported by substantial evidence and whether the decision is free of legal error.  *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005) (citing *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994)).  "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Greenspan*, 38 F.3d at 236).  "It is 'more than a mere scintilla and less than a preponderance.'"  *Id.*  (quoting *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002)).  It is "such relevant evidence as a reasonable mind might accept to support a conclusion.  It must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no

contrary medical evidence.'" *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

In applying the substantial evidence standard, the reviewing court critically inspects the record to determine whether such evidence is present, "but may not reweigh the evidence or substitute its judgment for the Commissioner's." *Perez*, 415 F.3d at 461 (citing *Greenspan*, 38 F.3d at 236; *Masterson*, 309 F.3d at 272). Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390 (1971). "Conflicts of evidence are for the Commissioner, not the courts, to resolve." *Perez*, 415 F.3d at 461 (citing *Masterson*, 309 F.3d at 272).

## IV.
### LAW AND ANALYSIS

### A.  *Burden of Proof*

The burden of proving that he or she suffers from a disability rests with the claimant. *Perez*, 415 F.3d at 461. The Social Security Administration defines a "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" lasting at least twelve months. 42 U.S.C. § 423(d)(1)(A). The ALJ conducts a five-step sequential analysis to evaluate claims of disability, asking:

> (1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe impairment[3]; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart

---

[3] A severe impairment or combination of impairments limits significantly a claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). Basic work activities are defined at 20 C.F.R. § 404.1521(b). The term severe is given a *de minimis* definition as found in *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985). According to *Stone*, "[a]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." 752 F.2d at 1101 (quoting *Estran v. Heckler*, 745 F.2d 340, 341 (5th Cir. 1984)). If a severe impairment or combination of impairments is found at step two, the impairment or combined impact of the impairments will be considered throughout the disability determination process. 20 C.F.R. §§ 404.1520, 404.1523. A determination that an impairment or combination of impairments is not severe will result in a social security determination that an individual is not disabled. *Id.*

> P, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

*Id.* (citing 20 C.F.R. § 404.1520).  If the claimant meets the burden of proof on the first four steps, the burden shifts to the Commissioner on the fifth step to show that the claimant can perform other substantial work in the national economy.  *Id.*  "Once the Commissioner makes this showing, the burden shifts back to the claimant to rebut this finding."  *Id.* (quoting *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000)).

The analysis ends if the Commissioner can determine whether the claimant is disabled at any step.  *Id.* (citing 20 C.F.R. § 404.1520(a)).  On the other hand, if the Commissioner cannot make that determination, he proceeds to the next step.  *Id.*  Before proceeding from step three to step four, the Commissioner assesses the claimant's residual functional capacity (RFC).  *Id.*  "The claimant's RFC assessment is a determination of the most the claimant can still do despite his physical and mental limitations and is based on all relevant evidence in the claimant's record."  *Id.* at 461-62 (citing 20 C.F.R. § 404.1545(a)(1)).  Specifically, in determining a claimant's RFC, an ALJ must consider all symptoms, including pain, and the extent to which these symptoms reasonably can be accepted as consistent with the objective medical evidence and other evidence. 20 C.F.R. § 404.1529; Social Security Ruling 96-8p.  The ALJ must also consider any medical opinions (statements from acceptable medical sources) that reflect judgments about the nature and severity of impairments and resulting limitations.  20 C.F.R. § 404.1527, Social Security Rulings 96-2p, 96-6p.  The claimant's RFC is considered twice in the sequential analysis—at the fourth step it is used to determine if the claimant can still do his or her past relevant work, and at the fifth step the RFC is used to determine whether the claimant can adjust to any other type of work.  *Perez*, 415 F.3d at 462 (citing 20 C.F.R. § 404.1520(e)).

Here, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act from January 10, 2009, (the alleged date of onset) through June 25, 2011, because she had the RFC to perform light work with certain limitations and there were jobs that existed in significant numbers in the national economy that she could perform.  The ALJ found that beginning on June 26, 2011 plaintiff became disabled and continued to be disabled through the date of his decision because of a change in plaintiff's age category.

### B. *Plaintiff's Claims*

In her appeal plaintiff argues that substantial evidence does not support the ALJ's decision. Specifically, she sets forth the following assignments of error:

- The ALJ's Final Decision Violates Fifth Circuit Precedent and the Commissioner's Ruling SSR 83-20.

- Step Five Vocational Expert Testimony Fails to Support the ALJ's Conclusion that Plaintiff Retained the Capacity to Perform Alternate Work.

- The ALJ Denied Plaintiff Due Process of Law.

### 1. *Did the ALJ violate 5th Circuit Precedent and SSR 83-20?*

Plaintiff, relying on the case of *Spellman v. Shalala,* 1 F.3d 357 (5th Cir. 1993) and Social Security Ruling ("SSR") 83-20, argues that the ALJ's determination of the onset date of June 26, 2011. was incorrect because her decision was not based upon an informed medical judgment.  The Commissioner asserts that the ALJ properly relied on plaintiff's change in age classification to determine that plaintiff's disability onset date was on the day of the 55th birthday.

In *Spellman v. Shalala,* the plaintiff suffered from a slowly progressive mental impairment and argued that the determination of her onset of disability made by the Appeals Counsel was "arbitrary" and not based on "informed judgment."  The Fifth Circuit agreed and stated:

> We hold that in cases involving slowly progressive impairments, when the medical evidence regarding the onset date of a disability is ambiguous and the Secretary must infer the onset date, SSR 83-20 requires that the inference be based on an informed judgment. The Secretary cannot make such an inference without the assistance of a medical advisor.

1 F.3d, at 362.

Here, unlike *Spellman,* plaintiff did not claim, and the ALJ did not conclude, that she suffered from a "slowly progressive impairment" so the decision in *Spellman* is inapplicable.[4] Instead, the ALJ found that plaintiff possessed the RFC to perform light work from January 10, 2009 (the alleged date of onset) through June 25, 2011; however, once plaintiff reached the age of 55 on June 26, 2011, plaintiff's age category changed to an "individual of advanced age." The ALJ relied on Medical-Vocational Guidelines ("Grids") Rule 202.06 and determined that based on plaintiff's age, education, work experience, and RFC, a finding of "disabled" was required by the rule. Tr. 23-24. Because plaintiff had an RFC for light work, a high school education, skilled or semiskilled past relevant work with no transferrable skills, the ALJ was directed per the Grids to make a finding of disabled. *See* 20 C.F.R. Pt. 404, Subpt. P. App'x 2, R.202.06.

We find that the ALJ did not err in failing to rely on informed medical judgment to make her determination of plaintiff's onset date. Again, there was no medical evidence and plaintiff did not claim that she suffered from a slowly progressive impairment. The ALJ properly considered the Grids to determine plaintiff's onset date and we find plaintiff's argument without merit.

### 2.  *Does vocational expert testimony support the conclusion that plaintiff could perform work?*

Plaintiff maintains that the ALJ erred in determining that plaintiff could perform alternate work that existed in significant numbers in the national economy. Plaintiff argues that on cross-

---

[4] The ALJ found at Step 2 that plaintiff suffered from back disorder, hypertension, angina secondary to mild heart enlargement, obesity, and depression.

examination the vocational expert ("VE") testified (1) that plaintiff, who was limited to occasional stooping, could not perform light work activity, and (2) that a person with 12 "marked" mental limitations could not perform light work.  In response, the Commissioner argues that substantial evidence supports the ALJ's finding that jobs existed in significant numbers in the national economy that plaintiff could perform.  The Commissioner asserts that the ALJ properly incorporated the functional limitations that she recognized into a hypothetical question and properly relied on the VE's testimony to support her findings.

At Step 5 of the sequential evaluation, the burden shifts to Commissioner who must demonstrate that other work exists in significant numbers in the national economy that the plaintiff can perform considering her RFC, age, education, and work experience.  20 C.F.R. 404.1512(f).  In order to meet his burden the Commissioner may look to the Medical-Vocational Guidelines ("Grids"), expert vocation testimony, or other similar evidence.  *Fraga v. Bowen,* 810 F.2d 1296, 1304 (5th Cir.1987).  A vocational expert's opinion is valuable because "he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed."  *Fields v. Bowen,* 805 F.2d 1168 (5th Cir. 1986).  An ALJ is permitted to rely on the expertise of a vocational expert to determine whether the plaintiff's residual work skills can be used in other occupations and in identifying the specific occupations in which those skills may be used.  20 C.F.R. 404.1566(e).

Here, the ALJ asked the VE the following hypothetical question:

Q:    I'd like you to consider the following hypotheticals: I'd like you to assume an individual of the same age, education, and past work experience as the claimant, and possessing the residual functional capacity to perform light work.  To that, I add the following limitations: that the person would never climb ladders, ropes, or scaffolds, would only occasionally stoop, crouch, kneel, or crawl, only occasional bilateral overhead reaching, and work in a low stress job, defined as having only occasional changes in the work

setting.  Would an individual with these limitations be able to perform claimant's past work?

A:      No.

Q:      And in your opinion, are there other jobs that such an individual could, in fact, perform?

Tr. 100-101.  The VE answered this question affirmatively and identified the jobs of usher/lobby attendant, hand packer/packager, and crossing guard.[5]  The VE classified all three jobs as "light duty, unskilled, and within the confines of the hypothetical question."  Tr.100.

On cross-examination by plaintiff's non-attorney representative, the VE was asked the following questions:

Q:      Mr. Peterson, under the Social Security Administration's definitions – it looks like SSR 83-10 and 85-15 – stooping is defined as bending the body downward and forward by bending the spine at the waist.

A:      That's correct.

Q:      Consequently, if a claimant had to bend to lift items from the floor in the performance of this work and could only lift occasionally, then that claimant could not perform light work activity.  Is that right?

A:      It'd be very possible.  That's correct.  Yes.

                                  …

Q:      Mr. Peterson, physically, therefore, a restriction to occasional stooping eliminates all light work activity that requires frequent lifting, yes?

A:      To that? Yes.

Plaintiff argues that because the VE testified that occasional stooping eliminates all light work activity that requires frequent lifting, the ALJ erred in relying on his testimony to find that there were jobs that existed that plaintiff could perform.  We reject this argument.

_____

[5] The VE testified that the job of usher/lobby attendant had 900 jobs in the State of Louisiana and 106,000 nationally, hand packer/packager had 3,800 jobs in Louisiana and 466,000 nationally, and crossing guard had 820 jobs in Louisiana and 71,000 nationally.  Tr. 100-01.

First, we note that the VE never testified that any of the jobs he listed – usher/lobby attendant, hand packer/packager, and crossing guard – required frequent lifting.  He also never testified that plaintiff could *not* perform any of the specific jobs he listed.  In fact, the substance of the VE's testimony was that an occasional stooping restriction eliminates light work that requires frequent lifting.  The VE never contradicted his testimony that an individual with plaintiff's age, education, past work experience, and RFC could perform the jobs of usher/lobby attendant, hand packer/packager, and crossing guard and the ALJ properly relied on that testimony to support her finding at Step 5.

Plaintiff also argues that the ALJ erred in relying on the VE testimony because the VE testified that an individual with 12 "marked" mental limitations would not be employable.  Tr. 120-21.  When questioning the VE on cross-examination, plaintiff's non-attorney representative referred to a Mental Residual Functional Capacity Assessment prepared by Dr. Jerry Whiteman on June 6, 2008, wherein Dr. Whiteman opined that plaintiff had marked limitations in 14 out of 21 areas listed on the form.  *See* Tr. 468-70.  Plaintiff asserts that the ALJ erred in finding that she retained the capacity to perform work considering this testimony.  Again, we are not persuaded by this argument.

The ALJ specifically rejected the opinion of Dr. Whiteman in her opinion.  The ALJ stated:

> I specifically reject the Mental RFC Assessment made by Dr. Whiteman on June 6, 2008, the day after he examined the claimant.  In the assessment, Dr. Whiteman checked boxes, indicating symptoms and limitations substantially more extreme than the information in his consultative report would support.  For example, Dr. Whiteman checked off symptoms of psychomotor agitation or retardation and decreased energy.  However, those symptoms are not mentioned at all in his report.  Further, Dr. Whitman checked off boxes indicating that the claimant has marked limitations in sustaining concentration and persistence, and marked limitations in social interaction.  However, Dr. Whitman noted upon a mental status examination in his report, that the claimant's memory and concentration skills were in the average range; that she has friends

> with whom she enjoys visiting; and that her judgment and insight reflect knowledge of appropriate social behaviors.
>
> …
>
> Dr. Whiteman saw the claimant on only one occasion. His opinion rendered on the day after his examination is unsupported by his own report, as well as by the treatment evidence …

Tr. 17.

Because the ALJ did not recognize Dr. Whiteman's limitations and the record as a whole does not support these limitation, the ALJ was not bound by this testimony. *See Owens v. Heckler,* 770 F.2d 1276, 1282 (5thCir. 1985)(The ALJ is not bound by hypothetical assumptions that are not supported by objective medical evidence.).

We find that substantial evidence supports the ALJ's finding at Step 5 that there were jobs that existed in significant numbers in the national economy that the plaintiff could perform.

### 3. Was plaintiff denied due process of law?

In her last assignment of error, plaintiff argues that she was denied due process because the ALJ did not hold a supplemental hearing to allow her to cross-examine Dr. Jerry Whiteman.

Prior to her administrative hearing plaintiff requested that a subpoena issue for Dr. Whiteman to testify at the hearing. Tr. 241. The ALJ issued a subpoena and Dr. Whiteman testified by telephone at the hearing. Plaintiff's non-attorney representative was allowed to question Dr. Whiteman about his examination of plaintiff. Tr.69-81. During the course of Dr. Whiteman's testimony, he referred to a Mental Residual Functional Capacity Assessment ("MRFCA") which was not included in the administrative record. Dr. Whiteman agreed to submit the MRFCA to the ALJ the next day.

On November 30, 2011, the ALJ sent a profer notice to plaintiff's representative proposing to enter into evidence the MRFCA prepared by Dr. Whiteman and informing plaintiff of her right

to request a supplemental hearing and subpoena witnesses.  Tr. 322-23.  In response, plaintiff requested a fully favorable decision based on the new evidence or alternatively requested a supplemental hearing and a subpoena for Dr. Whiteman to attend the hearing.  Tr. 321.  The ALJ issued her opinion on February 3, 2012 without holding a supplemental hearing.

The Commissioner argues that plaintiff has not been denied due process because she was given the opportunity to cross-examine Dr. Whiteman at the administrative hearing and plaintiff cannot, and has not, shown prejudice resulted from the denial of a supplemental hearing.

The Fifth Circuit in *Lidy v. Sullivan,* 911 F.2d 1075, 1077 (5th Cir.1990) held that due process entitles a disability claimant to cross examine individuals whose reports are considered as evidence in the disability determination.  *Id.* at 1077.  The court went on to find that "[d]ue process requires that a claimant be given the opportunity to cross-examine and subpoena the individuals who submit reports."  *Id.*, *quoting Coffin v. Sullivan,* 895 F.2d 1206, 1212 (8th Cir.1990).

When post-hearing evidence is obtained, the Hearings, Appeals, and Litigation Law manual (HALLEX)[6] I-2-7-30 entitled "Proffer Procedures" provides that an ALJ:

> [M]ust proffer all posthearing evidence unless:
> - The evidence was submitted by the claimant or the claimant's representative and there is no other claimant to the hearing.
> - The claimant has knowingly waived his or her right to examine the evidence. (See I-2-7-15, Waiver of the Right to Examine Posthearing Evidence.)
> - The ALJ proposes to issue a fully favorable decision.

In a case cited by the Commissioner, *Bayer v. Colvin,* 2014 WL 541294 (5th Cir. Feb. 12,

---

[6] While HALLEX does not carry the authority of law the Fifth Circuit held in *Newton v. Apfel,* 209 F.3d 448, 459 (5th Cir.2000), that "where the rights of individuals are affected, an agency must follow its own procedures, even where the internal procedures are more rigorous than otherwise would be required."  *quoting Hall v. Schweiker,* 660 F.2d 116, 119 (5th Cir.1981).  If prejudice results from a violation, the result cannot stand.  *Id.*

2014), the court distinguished *Lidy*.  In *Bayer*, a VE testified at the administrative hearing and plaintiff's counsel was allowed to cross-examine the VE.  After the administrative the hearing concluded, the VE provided the court with occupational codes from the DOT that he did not have when he testified at the hearing.  The ALJ advised plaintiff's counsel that the VE had provided the codes and counsel asked that an interrogatory be submitted to the VE.  The ALJ denied the request. Plaintiff appealed claiming a denial of due process.  The court found that there was no denial of due process because plaintiff's counsel "had the opportunity to fully cross-examine the VE at the administrative hearing."  *Bayer* at *5.  The court noted that in *Lidy* the claimant was completely denied the opportunity to cross-examine the witness.

We find this case more akin to *Bayer*.  Here, The ALJ did issue a subpoena for Dr. Whiteman to appear at the November 3, 2011, hearing.  Plaintiff's non- attorney representative was given a full and fair opportunity to cross-examine Dr. Whitman regarding the contents of the MRFCA at that hearing.  Thus, we do not find a violation of due process.

We also find that plaintiff has failed to show prejudice resulted from the denial of a supplemental hearing.  In *Lidy*, the court noted that in the ALJ's opinion denying disability, the ALJ relied heavily on the doctor's report that was submitted after the hearing.  Conversely, the ALJ here "specifically reject[ed]" the MRFCA submitted by Dr. Whiteman thus it did not form the basis of her denial of disability.  Further, the report submitted by Dr. Whiteman is dated June 6, 2008, almost six months prior to the relevant time period which began on January 10, 2009, plaintiff's alleged onset date.

For these reasons, we find that plaintiff was not denied due process and remand is not required.

# V.
## CONCLUSION

Based on the foregoing, we find substantial evidence of record and relevant legal precedent support the ALJ's decision that plaintiff is not disabled.  It is therefore RECOMMENDED that the ALJ's decision be AFFIRMED and this matter be DISMISSED with prejudice.

Under the provisions of 28 U.S.C. §636(b)(1)(C), the parties have fourteen (14) days from receipt of this Report and Recommendation to file any objections with the Clerk of Court.  Timely objections will be considered by the district judge prior to a final ruling.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING ON APPEAL, EXCEPT UPON GROUNDS OF PLAIN ERROR, THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT.**

THUS DONE this 22nd  day of June, 2015.

_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE